**The STATE of Ohio, Appellee,**

**v.**

**BOBO, Appellant.**

[Cite as *State v. Bobo* (1989), 65 Ohio App.3d 685.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 56335.

Decided Dec. 18, 1989.

*John T. Corrigan,* Prosecuting Attorney, and *Matthew T. Brady,* Assistant Prosecuting Attorney, for appellee.

*James R. Willis,* for appellant.

ANN MCMANAMON, Chief Justice.

Defendant Karlos Bobo timely appeals his conviction for aggravated murder (R.C. 2903.01) with a firearm specification (R.C. 2929.71), raising seven assignments of error.[1] Bobo claims: (1) his confession was coerced and that the

---

**1.** See Appendix.

trial court erred by twice denying his motion to suppress his statements to police; (2) his waiver of rights was ineffective in the absence of parental guidance; (3) other acts testimony admitted was more prejudicial than probative; and (4) the court abused its discretion by admitting rebuttal testimony regarding other alleged criminal acts. We find none of the assignments of error is well taken and affirm his conviction.

Maurice Dunklin, an erstwhile associate of Bobo, testified for the state. He related that on October 6, 1987, Dunklin, Bobo and William Harris drove to pick up some "short money"—money due them from the sale of cocaine. Bobo carried an aluminum baseball bat and Harris a .44 magnum revolver, but Dunklin went in empty-handed.

King invited the trio into the apartment. A "fat chick," later identified as Billie Jean Finklin, and Dennis Yarborough were at the kitchen table "getting high." Yarborough fled after Bobo struck him on the head with the bat.

Next, while Harris held the gun on King, Bobo rapped him on the legs. When Dunklin finally snatched the bat from Bobo, King escaped to the bedroom. Harris, however, kicked in the bedroom door and fired the gun. Dunklin, now in the kitchen, heard glass breaking, followed by a second shot. It was Bobo who carried the gun as the three ran from the apartment. Harris, Bobo and Dunklin drove to a house at East 55th Street and Hawthorne. While Dunklin remained in the car, Bobo went into the house. At that moment, Cleveland police, who were executing a search warrant at the house, seized Bobo.

Melvin King, the victim's brother, told the court he saw Bobo at the apartment three to four days before the murder with money in his hands and a "rock" of cocaine "behind him."

Donald Styles, a maintenance man at the Longwood Apartments, found the victim outside the East 35th Street apartment. Styles swore King told him "the guys with Karlos" shot him.

Billie Jean Finklin's testimony corroborated Dunklin's, except that she noticed each of the three visitors had a weapon. Finklin stated the trio demanded money and then started to hit King with "sticks." Billie Jean fled when she heard gunshots.

In defense, Bobo testified that, on the day in question, he asked Harris and Dunklin to drive him to East 79th Street and Kinsman to meet his father. They agreed to take him but told Bobo they first had to stop at an apartment on East 35th Street. Harris and Dunklin went into the apartment while Bobo sat outside on the hood of the car. Bobo heard a gunshot, followed by glass breaking, and then a second gunshot. He saw a man on the ground about

twenty-five yards away. Bobo started to run. According to Bobo, he and Mike Townsend later went to the Hawthorne Street house where police arrested them during a drug raid.

In assignments of error one, two and four, Bobo challenges the trial court's denial of his motion to suppress statements he made to the police. He argues that his statements were both involuntary and the product of an illegal detention.

 Bobo maintains that the statements he made to police were inadmissible because they were the fruit of an illegal seizure. This contention is incorrect. Although Bobo's initial detention was a seizure, we find it was lawful. Police arrived at 5801 Hawthorne to execute a search warrant while Bobo was in the house. A search warrant carries with it the limited authority to detain occupants of the premises while a proper search is executed, establishing probable cause to arrest. *Michigan v. Summers* (1981), 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340. See, also, *State v. Schultz* (1985), 23 Ohio App.3d 130, 23 OBR 242, 491 N.E.2d 735. In *Summers, supra,* police stopped the defendant on the front porch. As we have noted, police seized Bobo inside the house. After executing the search warrant, police arrested Bobo, Mike Townsend and several others on drug charges. Thus, unlike the defendant in *Dunaway v. New York* (1979), 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824, upon which Bobo relies, Bobo was legally detained.

Bobo, a seventeen-and-one-half-year-old juvenile when arrested, urges that his statements to the police, which implicated him in King's death, were involuntary. He maintains that his remarks were coerced because police held him for twelve hours, with one hand cuffed to a chair, in the narcotics unit, without food, sleep, or the presence of his parents.

 The state bears the burden of proving by a preponderance of evidence both the voluntariness of a defendant's custodial statements and waiver of *Miranda* rights. *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473; *State v. Hill* (1987), 37 Ohio App.3d 10, 523 N.E.2d 885. See, also, *Nix v. Williams* (1984), 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 388, fn. 5.

 We must examine the totality of the circumstances in order to determine whether there has been a waiver of the right to remain silent and to have the assistance of counsel, even where interrogation of a juvenile is involved. *Fare v. Michael C.* (1979), 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197; *State v. Davis* (1978), 56 Ohio St.2d 51, 10 O.O.3d 87, 381 N.E.2d 641; *State v. Carder* (1966), 9 Ohio St.2d 1, 38 O.O.2d 1, 222 N.E.2d 620; *State v. Newell* (Aug. 8, 1980), Cuyahoga App. No. 41391, unreported.

■ Bobo first argues that the presence of a parent is not only a circumstance we must consider, but an additional right accorded to juveniles. Though the greatest care must be taken to assure a juvenile's admissions are voluntary, parental presence is not constitutionally mandated. See *In re Gault* (1967), 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561.

We note that, in some jurisdictions, parental consultation is a prerequisite to the admission of a juvenile's statement. See, *e.g., People v. Saiz* (Colo.1980), 620 P.2d 15; *Lewis v. State* (1972), 259 Ind. 431, 288 N.E.2d 138. These states appear to rely on parental consent statutes which are not a part of Ohio juvenile law. In other jurisdictions, parental consent is one of the considerations in determining whether a confession is voluntary under the totality of the circumstances. See, *e.g., United States, ex rel., Riley, v. Franzen* (C.A.7, 1981), 653 F.2d 1153; *State v. Young* (1976), 220 Kan. 541, 552 P.2d 905; *Theriault v. State* (1974), 66 Wis.2d 33, 223 N.W.2d 850.

■ Ohio decisions, considering the totality of the circumstances in juvenile cases, have not turned solely on the presence or absence of a parent. See, *e.g., Carder, supra; Davis, supra; Newell, supra.* In view of the fact that Ohio juvenile law does not specifically require the presence of a parent during a juvenile's interrogation, we hold that such presence is only one factor in the totality of the circumstances surrounding the statements.

■ At the suppression hearing, John McKibben, a Cleveland detective, described the events which led to Bobo's statement to him. McKibben met with Bobo at 9:06 a.m. on October 7, 1987, to take him for trace metal detection and gunshot residue tests. He advised Bobo of his rights before they left. During the tests, Bobo made some statements to McKibben, and after they returned from the scientific investigation unit ("SIU"), McKibben readvised Bobo of his rights. Bobo made an oral waiver but asked to speak with his mother. McKibben admitted that he knew Bobo was a juvenile and that he did nothing to contact Bobo's mother. The detective averred that Bobo was alert and oriented when he made his statements.

Bobo also testified at the suppression hearing, swearing that he was handcuffed to a chair in a room occupied by five to seven other police officers. He alleged that McKibben lied when he stated that Bobo initiated their conversation and that Bobo told McKibben he wanted to talk to his mother before he made a statement. Bobo claimed he was afraid.

On cross-examination, Bobo admitted he had been arrested on two previous occasions and that both times police read him his rights. He acknowledged he did not request an attorney, only his mother. Bobo did not deny that

McKibben advised him of his rights nor did he claim he was denied counsel. Bobo's sole complaint was that he could not talk with his mother.

In view of all the circumstances before the trial court, we cannot say it erroneously denied the suppression motion.

■ Bobo next claims the judge erred by denying his renewed motion to suppress at the close of the evidence. The state argues that Bobo could not renew the motion at the close of the evidence because Crim.R. 12(B)(3) mandates that suppression motions be made before trial. Bobo correctly argues that the trial court may extend the time for making a motion to suppress in the interests of justice. See Crim.R. 12(C).

Evidence adduced at trial revealed that police advised Bobo of his rights to counsel and silence immediately upon his detention. When arrested, Bobo told the police his name was Michael Townsend. After police learned Bobo's true identity and age, they removed him from the adult detention area and took him to the narcotics unit where they handcuffed one of his wrists to a chair.

Shortly before midnight, Bobo spoke with John Bonner, an FBI agent working with the Cleveland narcotics unit. After another officer re-advised Bobo of his rights, Bobo volunteered to show the officers a guarded car on East 79th and Kinsman where the police might find drugs. Bonner, Bobo and Cleveland police officer Parkinson drove to the area. Later, they cruised past the murder site. The officers asked Bobo if he knew whether the East 35th Street apartment was a drug distribution point. Bobo acknowledged that it was. He also volunteered that he was at the East 35th Street apartment when, earlier that night, Richard King was beaten and thrown from a window. Police then returned Bobo to the narcotics unit.

Parker Adrine, a Cleveland homicide detective, spoke with Bobo while he was held in the narcotics unit. His partner advised Bobo of his rights before they questioned him. Adrine swore Bobo was alert and did not request food, sleep or counsel. Adrine told the court that he finished talking with Bobo at about 6:00 a.m. No other officer spoke with Bobo until 9:00 a.m., when McKibben took Bobo to SIU for tests.

Bobo does not deny that police repeatedly told him he had a right to counsel and to remain silent. He now claims he did not understand the police. At the time of the crime, Bobo was a seventeen-and-one-half-year-old attending high school and had two previous encounters with police.

We find that, in view of all the circumstances, the trial court properly denied Bobo's renewed motion.

The first, second and fourth assignments of error are not well taken.

In his third assignment, the defendant posits that, because police did not take him to a juvenile detention center as required by R.C. 2151.311, the violation of the statute renders his confession inadmissible.

R.C. 2151.311 requires a person taking a juvenile into custody to bring the child to court, to a place of detention, or to release the child to his parents, with all reasonable speed. See, also, Juv.R. 7(B). A detention home admissions officer is required to contact the juvenile's family. Juv.R. 7(E).

Under the circumstances of this case, we cannot find that the delay between taking the defendant into custody and his subsequent release to the care of the juvenile detention facility was unreasonable. In addition, the fact that police did not immediately take Bobo to a juvenile facility does not render his statements inadmissible. *State v. Stewart* (1963), 120 Ohio App. 199, 29 O.O.2d 4, 201 N.E.2d 793, affirmed (1964), 176 Ohio St. 156, 27 O.O.2d 42, 198 N.E.2d 439; *State v. Dickens* (Sept. 23, 1987), Summit App. No. 12967, unreported, 1987 WL 17928; *In re Hawkins* (May 11, 1983), Lorain App. No. 3430, unreported, 1983 WL 4091.

The third assignment of error fails.

In the fifth and seventh assignments of error, Bobo claims the court improperly allowed the introduction of his "other acts and wrongs."

Bobo posits that Dunklin's testimony regarding Bobo's alleged participation in the sale of drugs was an inadmissible "other act" and was more prejudicial than probative.

Evidence of a person's other criminal acts, crimes or wrongs is inadmissible to prove a person's propensity to commit crime. Evid.R. 404(B); *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, certiorari denied (1989), 490 U.S. 1075, 109 S.Ct. 2089, 104 L.Ed.2d 653. Nevertheless, such evidence is admissible for other purposes in accordance in with R.C. 2945.59, as follows:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

The "other acts" evidence must be relevant to some issue involving proof of guilt. *State v. Hill* (1987), 37 Ohio App.3d 72, 523 N.E.2d 894. See, also, *Broom, supra.* We find that, evidence of a defendant's activities in

drug transactions is admissible in a murder trial to demonstrate that the defendant killed the victim to avenge theft of drug money. *Hill, supra.*

The state theorized that Bobo, Harris and Dunklin went to King's apartment to avenge the skimming of proceeds from the sale of drugs. To demonstrate Bobo's motive, the prosecutor elicited evidence of the defendant's recent participation in drug transactions. Dunklin swore that Bobo was a money courier and that Dunklin was his driver. In addition, Melvin King claimed he saw Bobo at the East 35th Street apartment with a large amount of money and some "rocks of cocaine."

This testimony "created a framework for considering whether * * * [Bobo] * * * was motivated by revenge." *Hill, supra,* at 75, 523 N.E.2d at 897. Thus, the testimony was admissible in support of the state's theory that Bobo was motivated to kill King in order to avenge the theft of the "skimmed" money. Moreover, we cannot say that the evidence was more prejudicial than probative. We hold that the probative value of the evidence of Bobo's past drug dealing substantially outweighed any possible prejudice. Cf. *Hill, supra.*

Bobo also argues that the court abused its discretion by admitting the "other acts" testimony. Abuse of discretion implies an unreasonable, arbitrary or unconscionable attitude by the court. *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144. Our review of the record reveals that the details supplied by the state's witnesses concerning the existence of a Detroit-based drug conspiracy formed part of the immediate background of crime and concerned events " 'inextricably related to the alleged criminal act.' " *Broom, supra,* 40 Ohio St.3d at 282, 533 N.E.2d at 690. We find no abuse of discretion by the trial court.

Accordingly, the fifth and seventh assignments of error are not well taken.

In the sixth assignment of error, the defendant claims the court improperly admitted rebuttal testimony. Bobo contends that the state's rebuttal evidence was offered to demonstrate his criminal tendencies and not to impeach his credibility.

On rebuttal, the state offered the testimony of Officer Adrine and Agent Bonner. Both men related the statements Bobo made during the early morning hours of October 7, 1987, after Bobo heard his rights. Bobo claims that these statements were offered solely to prove he was a drug dealer.

Evid.R. 613(B) requires that, before extrinsic evidence of a prior inconsistent statement by a witness is admissible, the witness must be afforded an opportunity to explain or deny the prior inconsistent statement. A proper foundation is laid when a witness denies making the statement.

*State v. Riggins* (1986), 35 Ohio App.3d 1, 519 N.E.2d 397; *State v. Talbert* (1986), 33 Ohio App.3d 282, 515 N.E.2d 968. "Whether to admit a prior inconsistent statement which is collateral to the issue being tried and pertinent to the credibility of a witness is a matter within the trial court's sound discretion." *Riggins, supra,* 35 Ohio App.3d at 3, 519 N.E.2d at 401–402.

■ At trial, Bobo denied: (1) involvement with drug sales, (2) telling police about a guarded car at East 79th and Kinsman, and (3) telling police his father was in the drug business. The state's rebuttal witnesses testified that Bobo told them otherwise. Thus, the evidence offered by the state went to Bobo's credibility. We find no abuse of discretion by the court in admitting the rebuttal evidence.

■ The court denied Bobo's request for a limiting instruction that the rebuttal testimony was to be considered for impeachment purposes only. We first note that Bobo's alleged statements to police and his denials that he made them were already in evidence. As we have determined, these statements were properly admitted and thus no instruction was necessary.

■ As to evidence of Bobo's drug involvement and Detroit connections, we reiterate our holding that this evidence was not only a demonstration of his motives but was also inextricably related to the crime. Further, the court instructed the jury that it was to consider evidence as to "other crimes or wrongs" only as it related to motive. Thus, any possible error in the court's refusal to limit this testimony to impeachment purposes only was harmless beyond a doubt.

Accordingly, the sixth assignment of error fails.

The judgment is affirmed.

*Judgment affirmed.*

PATTON and FRANCIS E. SWEENEY, JJ., concur.

APPENDIX

Appellant's assignments of error are:

I

"The court erred in denying the defendant's motion to suppress and exclude the various self-incriminating statements extracted from him in violation of due process, which motion was renewed at the close of all the evidence."

APPENDIX—Continued

## II

"Given the lack of probable cause to seize, arrest and/or detain the appellant, the court erred in refusing, or merely failing, to suppress the confessions and self-incriminating statements made by him in the wake of these violations of his fourth amendment rights."

## III

"The trial court erred when it refused to reconsider, at the close of all the evidence, the appellant's motion to suppress and exclude the various statements made by him to the police while he was [in] the police station."

## IV

"The trial court erred when it refused to reconsider, at the close of all the evidence, the appellant's motion to suppress and exclude the various statements made by him to the police while he was in the police station."

## V

"The court erred in admitting, and the accused was prejudiced by the jury's consideration of, certain testimony provided by the witness Dunklin, which testimony tended to show the defendant and others were involved in certain uncharged drug and drug related financial dealings and the like."

## VI

"The court erred in admitting as substantive proof certain testimony by detective Parker Adrine and FBI Agent Bonner, which testimony was ostensibly, although improperly, admitted as rebuttal evidence."

## VII

"The court erred or abused its discretion in admitting, over objection and under the guise of impeachment, considerable proof of other alleged criminal or bad acts committed by the appellant before the homicide."