[Cite as *In re E.A.E.*, 2019-Ohio-2749.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| IN RE: E.A.E. | : | Appellate Case No. 28248 |
| | : | |
| | : | Trial Court Case No. 2018-580 |
| | : | |
| | : | (Appeal from Common Pleas Court – |
| | : | Juvenile Division) |
| | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of July, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery
County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301
West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek,
Ohio 45434
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} E.A.E. ("Evan"),[1] a minor, appeals from adjudication and dispositional orders of the Montgomery County Common Pleas Court, Juvenile Division, finding him responsible for one count of Sexual Battery, in violation of R.C. 2907.03(A)(2), which would be a felony of the third degree if committed by an adult.

## I. Procedural History

{¶ 2} On February 4, 2018, Evan was charged with one count of rape under R.C. 2907.02(A)(1)(a) and one count of sexual battery under R.C. 2907.03(A)(2), for an incident that occurred two days earlier. Evan denied both charges. Evan moved to suppress statements that he made during an interview with police officers. A hearing on the motion was held, and the trial court overruled the suppression motion. An adjudicatory hearing was held, and on October 24, 2018, the trial court found Evan not responsible for the charge of rape but found him delinquent for committing sexual battery. Evan was given a suspended commitment to the Department of Youth Services and ordered to complete probation.

{¶ 3} Evan appeals.

## II. Analysis

{¶ 4} Evan presents two assignments of error for our review. The first challenges the trial court's suppression decision, and the second challenges the manifest weight of the evidence.

## A. Motion to Suppress

{¶ 5} The first assignment of error alleges:

THE TRIAL COURT ERRED BY OVERRULING THE MOTION TO

---

[1] We use the pseudonym of "Evan" for the appellant, a juvenile.

SUPPRESS EVIDENCE.

**{¶ 6}** Evan argues that the trial court should have suppressed his statements to the police.

**{¶ 7}** "Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *See State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). But the appellate court must decide the legal questions independently, without deference to the trial court's decision. *Burnside* at ¶ 8." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 14.

**{¶ 8}** Appellate courts give great deference to the factual findings of the trier of fact. "At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. The trial court is in the best position to resolve questions of fact and evaluate witness credibility. In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." (Citations omitted.) *State v. Purser*, 2d Dist. Greene App. No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

**{¶ 9}** Testifying at the suppression hearing were Montgomery County police officer Bryan Camden; Dayton police detective Joshua Spears; Evan's former teacher Ashton Hood; and Evan's mother ("Mother").

{¶ 10} Officer Bryan Camden testified that he was called to Miami Valley Hospital on a sexual assault complaint on February 3, 2018; the assault was alleged to have happened the previous night. The victim named Evan as the perpetrator. Officer Camden then went to speak with Evan at his mother's home. Camden and another officer arrived around 10 p.m. and told Evan's mother that they needed to speak with Evan. Officer Camden said that they were invited into the doorway of the home. The officers then spoke with Evan and his mother outside the house, telling them about the allegations against Evan. Evan then went into detail about the prior night's incident. Thereafter, Officer Camden told them that due to the nature of the offense, Evan would have to be detained pending further investigation.

{¶ 11} Officer Camden said that, while speaking with the officers, Evan displayed a "calm" demeanor; Evan never said that he did not want to speak with the officers. Following the conversation, Officer Camden spoke to his supervisor and then placed Evan in the cruiser and transported him to the Safety Building. Camden said that he did not read Evan his *Miranda* rights at the time of their discussion on the porch because he was not under arrest. Officer Camden said that he did not speak further to Evan about the allegations after placing him in the cruiser.

{¶ 12} Officer Camden testified that he was not aware that Evan was on an individualized education program (IEP) or suffered from attention deficit disorder (ADD). Camden said that Evan did not give any indication that he had a learning disability and seemed to understand the discussion. Officer Camden admitted that he never explicitly told Evan that he did not have to speak with him. Camden did not recall Evan's mother objecting to Evan going to the station for more questioning. Despite not being allowed to

exit the cruiser once placed inside, the officers rolled down the window and allowed family to speak with Evan.

{¶ 13} Detective Josh Spears testified that he was off-duty at the time and was called in to respond to the sexual-assault complaint. Detective Spears first went to the victim's home to speak with her. He next went to the scene of the alleged offense to collect evidence. There he spoke with two witnesses. When Detective Spears arrived at the Safety Building around 12:47 a.m., Evan was in a temporary holding cell. Detective Spears escorted Evan, who was not handcuffed or shackled, to a separate room equipped with video-recording capabilities. At that time, Evan was about 14 years and 9 months old and was in the ninth grade. Spears read over the *Miranda*-rights form with Evan verbatim. He then told Evan of the charges, asked for a verbal understanding of the rights waiver, and had Evan initial next to each right as they were read to him. Detective Spears asked Evan if he had ever previously had *Miranda* rights read to him. Evan indicated that he had not, so Spears circled "N" on the form. Evan asked what a "lawyer" was and how to get one at no cost. Detective Spears said that he tried to explain the best he could. Evan did not know his social security number, which Spears believed was typical for juveniles. Detective Spears said that he did not ask Evan if he wanted an attorney. Detective Spears explained to Evan the process of obtaining DNA and told him that it can be used as "evidence," but Spears did not explain what "evidence" is. Detective Spears explained to Evan what "coercion" is and asked Evan if he would still like to speak with him. Evan indicated that he would and signed the rights waiver. Detective Spears said, at that point, Evan was no longer free to leave.

{¶ 14} Detective Spears testified that Evan's demeanor was calm and appropriate.

Spears said that Evan did not appear to be under the influence of drugs or alcohol, and was alert, coherent, and responsive throughout the interview. Detective Spears also said that Evan never mentioned any disabilities, nor did Spears ask about any disabilities. Evan's parents were not present, and Evan did not ask for a parent. Detective Spears said that twice he tried to call Evan's mother but could not get in contact with her. Spears said that it was department policy that if the alleged perpetrator was 14 years of age or older, he could be interviewed without a parent present.

{¶ 15} Detective Spears questioned Evan for an hour before Detective Elizabeth Alley began questioning him. Evan denied the allegations and believed that the encounter with the victim had been consensual. Officer Alley then told Evan that "everything is pointing at you." Officer Alley asked Evan if he was calling the victim a liar and suggested that no one would go through getting a rape kit if she had not actually been sexually assaulted. Officer Alley told Evan that the victim was going to give all the evidence she had to a prosecutor who would determine whether Evan "was a liar or a monster." Detective Spears asked Evan if he would take a polygraph test. Evan initially said that he did not want to take the test but later said that he would if his mother approved. Detective Alley believed that Evan's denials were not convincing and said that he was providing "bull crap answers."

{¶ 16} Detective Alley instructed Evan to look back at what happened and suggested that maybe the alleged victim did not want this encounter and Evan took it the wrong way. It was suggested to Evan that people have more respect for someone who is willing to admit what they did. The detectives told Evan that this was just a "bump in the road," a mistake, and that he was going to get the treatment that he needed. Detective

Spears testified that Evan said that he wanted to "fix the situation." Detective Spears then handed Evan a piece of paper on which to write an apology to the victim and left the room. Evan wrote an apology. Afterwards, Evan was told that "it's a good thing you're a juvenile," and "it took us a while to get there, but we'll get you treatment."

{¶ 17} The interview lasted about two hours. Evan was not asked if he had slept at all before the interview. Evan never asked for an attorney. After the interview, he was arrested.

{¶ 18} Ashton Hood testified that he was previously employed at Evan's school as a seventh- and eighth-grade math teacher. Evan was in Hood's seventh-grade math class. Hood acknowledged that Evan had a learning disability and was on an IEP. Hood said that when Evan was in his class in 2016, Evan was reading at a kindergarten level and was at a fourth-grade level in math. Evan had issues with listening comprehension, reading comprehension, and fluency. Hood said that Evan had difficulty processing information the first time and did small-group work with an intervention specialist. Hood believed that individualized learning improved Evan's focus and that oral reading of instructions was better for Evan than him having to read them himself. Clarifying questions would help Evan understand and sometimes it was necessary to repeat information for Evan to understand. Hood would isolate Evan and use a calm tone in addition to following up to make sure he understood or had his accommodations.

{¶ 19} Evan's mother testified that, around 8 p.m. on February 3, 2018, police officers knocked on her door and said that they needed to speak to Evan. Evan was in bed. Mother said that she told the officers that Evan was on an IEP and had a learning disability. She said that the officers were aggressive with her and Evan. Mother said that

she did not believe that Evan understood what was happening, because he asked her what was going on. She had to explain to him what a "sexual assault" is. Mother said that the officers told her that she could not go with Evan and that she would not be let into the Safety Building. Mother said that, while the officers were sitting in their cruiser with Evan, she told the officers that they did not have permission to speak to Evan. She also said that she asked for him to get out of the cruiser, which the officers would not allow. Mother testified she told the officers that they had a family lawyer. However, the trial court specifically indicated that "[d]espite [Mother's] testimony, no evidence of her mentioning an attorney, [Evan's] disabilities, or her refusal to have [Evan] interviewed was contained in the official dash cam video as reviewed by the Court. As such, the Court does not find [her] testimony to be credible in that respect." (Doc. #16 at 7-8). Mother said that she followed the cruiser to the Safety Building, where she sat outside for five or six hours. Around 4 a.m., Mother was told that Evan was being taken to the detention center. Officer Camden testified that he did not know Mother followed them to the station or tried to get in.

{¶ 20} In *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the U.S. Supreme Court held that a defendant who is subjected to custodial interrogation must be advised of his or her constitutional rights and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible. "The warnings required by *Miranda* are satisfied where, prior to the initiation of questioning, the police fully apprise the suspect of the State's intention to use his statements to secure a conviction and inform him of his rights to remain silent and to have counsel present." *State v. Blythe,* 2d Dist. Montgomery No. 24961, 2013-Ohio 1688,

¶ 9, citing *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

{¶ 21} In a pretrial suppression hearing, when the admissibility of a confession is challenged by the accused, the burden is upon the prosecution to prove compliance with *Miranda*, that a knowing, intelligent, and voluntary waiver of the defendant's rights was obtained or occurred, and that the inculpatory statement was voluntary. *State v. Seymour*, 10th Dist. Franklin No. 75AP-144, 1975 WL 181542, *5, citing *State v. Kassow*, 28 Ohio St.2d 141, 277 N.E.2d 435 (1971), *vacated in part*, 408 U.S. 939, 92 S.Ct. 2876, 33 L.Ed.2d 762 (1972). However, once the above elements have been established, the defendant then has the burden of proving his claim of involuntariness. *State v. Alford*, 2d Dist. Montgomery App. No. 23332, 2010-Ohio-2493, ¶ 9-10, citing *Kassow*. "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and the frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *vacated in part on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). When the suspect is a juvenile, the totality of the circumstances includes "the juvenile's age, experience, education, background, and intelligence" as well as his "capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

{¶ 22} Evan argues that, based on the totality of the circumstances, he could not have made statements to the detectives voluntarily and he could not have made a valid

waiver of his *Miranda* rights. He relies mostly on the evidence of his intellectual disabilities.

{¶ 23} We have reviewed the entirety of the police station video recording which was introduced as a joint exhibit at the suppression hearing. It did not appear that Evan's disabilities, whatever they are, rendered him incapable of understanding or waving his rights. Evan was alert and responsive throughout the interview and seemed competent to understand what was being said to him. It appears that the detectives took caution in reading his rights aloud to him, rather than having Evan read them himself. Evan was also in an isolated area where the focus was on only him. He initialed each response to signify understanding. If Evan had any questions, the detectives attempted to answer them. Surely, the detectives and officers could have asked about any disabilities. Evan could have stated it to the officers as well.

{¶ 24} Detective Spears read Evan his rights verbatim from the pre-interview form. Notably, Evan was able to read the first right out loud to Detective Spears with no problem or hesitation. While reviewing the *Miranda* warnings, Evan asked two questions that Spears then explained to him: what a lawyer was and what it meant to get an attorney at no cost to him. When Evan indicated he did not understand something, Detective Spears explained what it meant and then verified with Evan that he understood. Detective Alley asked Evan if he had any questions about the form and he responded no. Evan agreed to speak with the detectives and signed the pre-interview form.

{¶ 25} Evan did not make any statements indicating he did not want to speak to detectives. He did not ask for an attorney or his mother at any time even though Detective Spears explained what an attorney did and informed Evan he could have an attorney at

any time. The interview was video and audio recorded, and Evan signed a written waiver of rights form. The circumstances suggest that Evan made a knowing, intelligent, and voluntary waiver and his statements were voluntary. When reviewing Evan's rights, Detective Spears repeatedly asked Evan if he understood and, if he did not, then Detective Spears explained the information to him. After the explanations, Detective Spears then confirmed that Evan understood the explanation and his rights. Evan initialed each of the rights and signed at the bottom of the pre-interview form. When asked if he had any questions about the form after having reviewed it in its entirety with Detective Spears, Evan stated he did not have any questions.

{¶ 26} At no point during the interview was there an indication or threat of physical abuse, or deprivation of food, medical treatment, or sleep. Before the interview began, Detective Spears asked Evan if he needed any water or wanted to use the bathroom, to which Evan responded in the negative. Detective Spears again offered water to Evan right before a break in the interview which Evan declined. At the time of the interview, Evan was not handcuffed or placed in shackles. Even though the interview occurred late at night, Evan was alert and oriented and did not appear to be nodding off or falling asleep. Toward the end of the interview, Evan requested to use the restroom, and he was promptly taken to the restroom.

{¶ 27} Evan's former teacher, Ashton Hood, testified regarding Evan's reading abilities and IEP, however, the information was based on Evan's abilities from two years prior to the time of the interview. Thus, it did not necessarily reflect Evan's abilities at the time of his interview. Even still, Hood indicated that Evan processed information better when he worked one-on-one with people and when instructions were read orally to Evan

-- the same format Detective Spears used when reviewing Evan's *Miranda* rights. Additionally, Hood testified that asking Evan clarifying questions would help Evan understand things better, which is what Spears did throughout Evan's interview.

{¶ 28} While it may be considered a factor in the totality of the circumstances analysis, the fact that Evan's mother was not present during the interview did not render his waiver of rights and his subsequent confession involuntary, as Evan suggests. Notably, "parental presence is not constitutionally mandated," such that Detective Spears was required to ensure that Evan's mother was present at the time of the interview. *State v. Bobo*, 65 Ohio App.3d 685, 690, 585 N.E.2d 429 (8th Dist.1989); *see also In re Watson*, 47 Ohio St.3d 86, 548 N.E.2d 210 (1989) (explaining Ohio's rejection of standard requiring independent advice/interested adult for juveniles during custodial interrogations). A juvenile's access to advice from a parent, guardian or custodian also plays a role in assuring that the juvenile's waiver is knowing, intelligent, and voluntary. *See In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 96. However, failure to consult with a parent prior to the interview does not render statements inadmissible. *In re Watson* at *89. Before the interview, Evan had been informed of the nature of the allegations while he was at his home with his mother present. Although his mother was not present during the interview, Evan was aware that he could speak to her as demonstrated by the fact that Evan told detectives he would take the polygraph if his mother told him to. Moreover, at no point did Evan request a parent be present during the interview. Thus, this factor does not override the knowing, intelligent, and voluntary waiver of Evan's *Miranda* rights or render his statements involuntary.

{¶ 29} The state proved that Evan's waiver of his *Miranda* rights was done

knowingly, voluntarily, and intelligently. The first assignment of error is overruled.

## B. Manifest Weight

{¶ 30} The second assignment of error alleges:

THE ADJUDICATION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 31} "To evaluate a claim that a [court's] verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983)." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 168.

{¶ 32} The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of fact to resolve. *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 65, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *Id*. at ¶ 67. The credibility of the witnesses and the weight to be given to their testimony were matters for the trier of fact to resolve, and the trier of fact is entitled to believe the state's witnesses over the defendant. *Id.* at ¶ 69.

{¶ 33} Evan was adjudicated responsible for sexual battery under R.C. 2907.03(A)(2), which prohibits a person from engaging in sexual conduct with another

person when "[t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." Evan argues that his adjudication for sexual battery was against the manifest weight of the evidence. The victim testified that she was leaning on the wall and dozing off, then she woke up and Evan was on top of her. The victim testified that she was trying to close her legs but Evan would not let her. Evan did not testify, but he told detectives that he went over to the victim and began pulling her pants off and she did not say anything. Evan said that in the middle of having sex, she pulled her pants up and he stopped. Evan never said that the victim was or appeared to be dozing off. As soon as she indicated she did not want to have sex, he said he stopped.

{¶ 34} The victim testified that she went to her friend's house after school. While there, the victim, her friend, and Evan smoked a marijuana blunt together that Evan had brought. They then went upstairs to the friend's bedroom. At some point, Evan and the victim were left alone in the room. The victim was on her phone and Evan, joking around, took her phone. When she got her phone back, Evan shut the bedroom door, locked it, and turned the lights out. The victim was sitting on the bed leaning against the wall and playing on her phone when Evan grabbed the phone again. The victim then dozed off, as a result of smoking the marijuana. (Tr. Vol. II, p. 15).

{¶ 35} When she woke up, the victim was lying on the bed with Evan on top of her. She did not know how Evan got on top of her or how she had gotten onto her back, because it happened while she was asleep. When Evan pulled her pants down, she tried to close her legs but could not. She also could not push Evan off of her. During the struggle, Evan covered the victim's mouth with his mouth to prevent her from saying

anything, resulting in him drooling on her neck. Evan had his penis inside the victim's vagina but did not ejaculate.

**{¶ 36}** Evan's story changed during his interview with police, but he eventually admitted that he had turned off the lights, closed and locked the door, and initiated intercourse. Evan knew that the victim had smoked the marijuana, as he had provided it. According to Evan, only about two to three minutes passed from the time they were downstairs smoking marijuana until the time that he and the victim were having sex upstairs. (Joint Ex. at 1:50:02). Evan also stated that they were all high from smoking the marijuana, including the victim. (*Id.* at 1:48:32; 1:54:24). Perhaps most telling, Evan said during his interview that he had purposely given her the marijuana so she would have sex with him. (Tr. Vol. II, p. 151; Joint Ex. at 2:14:05).

**{¶ 37}** In our opinion, this is not the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. Given the evidence, we conclude that the juvenile court neither lost its way nor created a miscarriage of justice in adjudicating Evan for sexual battery. Evan stated that he was aware that the victim was high as a result of smoking the marijuana and in fact provided the marijuana with the purpose to get her to have sex with him. Only a few minutes passed after smoking the marijuana before she fell asleep and he proceeded to engage in sexual conduct with her. Thus, Evan was aware that her ability to appraise the nature of or to control her own conduct was substantially impaired.

**{¶ 38}** The second assignment of error is overruled.

### III. Conclusion

{¶ 39} We have overruled both of the assignments of error presented. The trial court's judgment is therefore affirmed.

. . . . . . . . . . . . .


WELBAUM, P.J. and DONOVAN, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Heather N. Jans
Robert Alan Brenner
Hon. Helen Wallace